## Zonia Gent v. The People of the State of Illinois.

1. MOTIVE—*what evidence competent upon, in criminal prosecution.* Letters which tend to show the relations between the accused and the party assaulted, are competent upon the question of motive.

2. INSTRUCTION—*should not be argumentative.* An instruction is improper which is argumentative in form.

Criminal prosecution for assault. Error to the Circuit Court of Jackson County; the Hon. WILLIAM N. BUTLER, Judge, presiding. Heard in this court at the August term, 1906. Affirmed. Opinion filed March 15, 1907.

SCHWARTZ, MARTIN & LIGHTFOOT, for plaintiff in error.

JOHN VENABLE, State's Attorney, for defendant in error; HERBERT & LEVY, of counsel.

MR. JUSTICE HIGBEE delivered the opinion of the court.

This was a criminal prosecution against Zonia Gent, plaintiff in error, under an indictment charging her with an

assault to kill and murder Orphia Dillinger. She was con-
victed of an assault with a deadly weapon upon said Orphia
Dillinger, with intent to inflict upon her person a bodily
injury, where the circumstances of such assault showed an
abandoned and malignant heart. A motion for a new trial
was overruled and plaintiff in error was sentenced to pay a
fine of $200 and costs of suit.

The proofs in the case show that Mrs. Dillinger and Mrs.
Gent, with their families, lived for a number of years upon
adjoining farms, a short distance northwest of Carbondale,
Illinois. They appear to have been on friendly relations
and had visited back and forth as neighbors until about three
years before the alleged assault, which is said to have taken
place on October 13, 1904, when some trouble arose between
them and friendly relations ceased. After that time and
prior to the assault, Mrs. Dillinger received five different
letters through the mail, to four of which the name of Zonia
Gent was attached, the other being signed "You know who
I am." These letters were obscene in character and called
Mrs. Dillinger vile and opprobrious names, and several of
them threatened her life. Mrs. Dillinger swore they were
all in the handwriting of Mrs. Gent; that Mrs. Gent ad-
mitted to her she wrote two of them and said she would write
what she "darn please" and that she would kill her if she
ever caught her in the road. The husband of Mrs. Dil-
linger corroborated his wife as to the admission on the part
of Mrs. Gent. Mrs. Gent denied having written the letters
and the conversation in which she is said to have admitted
the same. There was also a letter which the husband of
Mrs. Dillinger swore he picked up on the road, addressed to
him and signed Eona Gent, which was claimed to have been
changed from or intended for Zonia Gent. This letter
warned him off of the place. Mrs. Dillinger saved the five
letters received by her and for a considerable time kept three
of them locked in a trunk. The two others she carried in
her pocketbook for a while and afterwards in her stocking.
On the afternoon before the assault, the trunk was broken
into and the three letters in the trunk were taken. The

other things in the trunk, some of which were said to have been valuable, were left undisturbed. On the next day, Mr. Dillinger took the two letters his wife had left, and went to town to consult a lawyer. On his return home he gave his wife the letters and she put them in her left stocking. Shortly after noon she and her nine-year-old son Rolla went out in the pasture, between her house and the Gent dwelling, to get some hickory nuts. Soon after this the boy Rolla came running back to Mr. Dillinger, who was engaged at the barn, crying, and said that his mother was hurt. The husband went to her and found her lying unconscious in the pasture on the bank of a creek. He took her to the house and sent for a doctor, who found a wound on her head, apparently made with a blunt instrument, and that she was suffering from a concussion of the brain from which she did not regain consciousness for several days; the front of her dress was torn open, the left stocking was torn and the letters which had been in the stocking were gone. The bank of the creek at this point was about 10 or 12 feet high and there was a cow path leading up the bank near by. The place where Mrs. Dillinger was found was some 378 feet from the Dillinger home and about 400 feet from the Gent home. The view between the Gent house and the Dillinger house was unobstructed, but the place where the assault is said to have taken place was obscured from the Gent house by high weeds and other surrounding conditions. Mrs. Dillinger swore that as she was walking along in the woods pasture, some one hit her on the back of the head and knocked her down; that she did not see any one before she was struck; that she turned over and saw Zonia Gent who began tearing her clothes; that Mrs. Gent then hit her on the top of the head and she became unconscious. Rolla Dillinger swore that at the time of the assault his mother was looking for the cattle and he was coming behind her with some hickory nuts; that he saw Zonia Gent, whom he knew, come up the creek bank; that she had on a long blue apron; that she pulled a club from under her apron and struck his mother, who fell to the ground; that Zonia Gent then threw

the club across the creek and he ran to the house and told his father; that he found the stick on the opposite bank of the creek from where his mother was struck upon the same evening and that the stick he referred to was the one introduced in evidence. Mrs. Gent denied that she made the assault charged against her and said that on the day in question she was engaged in making apple butter at her house and that about 9 o'clock in the morning she was taken with a severe sick headache from which she did not recover until 2 or 3 o'clock in the afternoon; that during "all this time she was lying on a lounge in the front room of her house." Her sister-in-law, Maude Dillinger, testified that she was there that day and cooked the dinner; that in going back and forth across the porch, between the summer kitchen and the dining room she could see Mrs. Gent lying on the lounge; that she got there about 9 o'clock in the forenoon and stayed until the next morning; that they made apple butter all day; that the apples were cooking in dish pans on the kitchen stove and were stirred in a kettle northwest of the house and that in the course of her work, she went from one place to the other; that every time she went into the kitchen she could see Mrs. Gent lying on the lounge and that she was there at 12 o'clock.

It was shown that the lounge on which Mrs. Gent was claimed to have been lying was by a window and that the bottom of the window and top of the lounge were about on a level; that there was no blind on the window and from it the Dillinger house could be seen; that on the same side of the room as the window was a door leading onto the porch; and that Mrs. Gent lying on the lounge could not be seen by any one in the dining room, which joined the front room on the south.

It will be seen that upon the main question the testimony was flatly contradictory. The jury which heard the testimony of the witnesses and saw them upon the stand, found the defendant guilty and in this verdict, in view of all the circumstances of the case, we concur.

Plaintiff in error complains that the court admitted in

Gent v. The People.

evidence testimony as to the contents of the letters taken from Mrs. Dillinger's trunk. Proof was made tending to show that the letters were written by Mrs. Gent and that they had been stolen from Mrs. Dillinger's trunk. It was therefore proper for the State to show the contents of the letters as the subject-matter tended to show the relations between the parties and possible motive for the alleged crime.

Plaintiff in error also insists that the court erred in giving instruction No. 16 for the people, which undertook to state the law in reference to the defense of an alibi and followed substantially an instruction approved in Creed v. The People, 81 Ill., 565, which has since been severely criticised in the case of Briggs v. The People, 219 Ill., 330. In the latter case, however, the court at the conclusion of its criticism of said instruction, also said: "It is true in this case the court instructed the jury properly that if considering all the evidence, including that of the alibi, the jury had a reasonable doubt of the defendant's guilt, they should acquit him and if the only grounds of reversal were the giving of the instruction, objected to, we should hesitate to reverse the conviction." In this case the court also instructed the jury that, "The law does not require that the defendant prove an alibi beyond a reasonable doubt, or even by a preponderance of the evidence, but if the evidence offered upon that point, when considered with all the other evidence, raises a reasonable doubt of the defendant's guilt, this is sufficient and you should give the defendant the benefit of such doubt and acquit her" and there were other instructions given to the same effect. While therefore the instruction is subject to criticism, we do not feel that under the circumstances of this case the conviction of the defendant should be reversed on that account.

Instruction No. 21 given for the people is also complained of by plaintiff in error. That portion of the instruction which discussed the question of the relative weight and credit to be given to positive evidence and to negative evidence or want of knowledge was argumentative and might well have been refused, but as applied to the testimony in

this case, we think the objectionable feature was harmless.

Upon examination we fail to find that the other instructions to which plaintiff in error has called our attention contain any objectionable features.

We find no reversible error in the record in this case and the judgment of the court below will therefore be affirmed.

*Affirmed.*